# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                                    **CIVIL ACTION**

**VERSUS**

**LEONARD L. GRIGSBY, ET AL.**                              **NO. 19-00596-BAJ-SDJ**

## RULING AND ORDER

The United States seeks to recover a $576,756 tax refund (plus interest) paid to Defendants Leonard and Barbara Grigsby, which, allegedly, resulted from the Internal Revenue Service erroneously granting a $1.3 million research expenses tax credit to Defendants' S-Corporation, Cajun Industries, LLC ("Cajun").

Now the Government moves for summary judgment **(Doc. 64, the "Motion")**, arguing that undisputed evidence establishes that Cajun, a construction company, did not conduct any qualified research activities during the tax year in question, and, by extension, Defendants are not entitled to the resulting refund. Defendants oppose the Government's Motion. (Doc. 71). For reasons to follow, the Government's Motion will be granted, and judgment will be entered in the United States' favor.

## I.    BACKGROUND

### A. Summary Judgment Evidence

The following facts are undisputed, as set forth in the parties' statements of undisputed facts supporting their respective memoranda (Doc. 64-2 ("USA SOF"), Doc. 71-1 ("Defendants SOF"), Doc. 79-1 ("USA Reply SOF")), the parties' Joint Statement Of Undisputed Facts submitted with their proposed joint Pretrial Order

(Doc. 82-1, "Joint PTO"), and the record evidence submitted in support of these pleadings.

### i. Relevant Tax History

Cajun is a civil construction company headquartered in Baton Rouge, Louisiana. Cajun contracts with hundreds of private and public clients throughout the Gulf South to provide a wide-range of construction services in various markets, including oil and gas; chemical processing; power and utilities; infrastructure; communications; and water quality.

Cajun is organized as a Subchapter S Corporation ("S-Corp") for federal income tax purposes, which means that Cajun's income, losses, deductions, and credits pass through to its shareholders on a *pro rata* basis. Cajun's tax year runs from October 1st through September 30th. At all relevant times, Defendant Leonard Grigsby owned a 73 percent interest in Cajun. (Joint PTO ¶¶ 2-4, 15, 17).

In 2015, Cajun hired alliantgroup LP [sic], a consulting firm, to analyze whether Cajun was entitled to amend its prior tax returns to claim additional credits for the 2011 through 2016 tax years. Specifically, alliantgroup reviewed whether (and to what extent) Cajun was entitled to a tax credit "for increasing research activities" under 26 U.S.C. § 41 (the "qualified research tax credit" or "QRTC"). Based on a sampling of 105 projects from Cajun's 2012 tax year, alliantgroup determined that Cajun was entitled to claim additional research credits exceeding $1.3 million. Thereafter, Cajun amended its tax return for the year ending September 30, 2013, claiming a QRTC in the amount of $1,341,420. Cajun had never before claimed the QRTC. (Joint PTO ¶¶ 5-6, 9, 19).

2

In conjunction with its amended return, Cajun issued an amended Form K-1 to its shareholders, including Mr. Grigsby. Mr. Grigsby's amended K-1 reported a *pro rata* allocation of Cajun's QRTC in the amount of $979,237. (Joint PTO ¶¶ 7-8).

Upon receiving the amended Form K-1, Defendants filed an amended federal income tax return for the 2013 tax year on which they reported Cajun's QRTC. Defendants' QRTC claim generated a tax credit in the amount of $954,527 and, after the credit was applied to reduce Defendants' 2013 tax liability, an overpayment in the amount of $576,756 *plus* statutory overpayment interest in the amount of $73,663.38 (collectively, the "Contested Refund"). (Joint PTO ¶¶ 10-11).

On September 15, 2017, the IRS issued a tax refund check to the Defendants for the 2013 tax year, which included the Contested Refund.[1] (Joint PTO ¶¶ 12-14).

### ii. Relevant Activities Resulting in Cajun's Claimed QRTC

The parties agree that a sampling of four of Cajun's projects during the tax year ending September 2013 is determinative of the outcome of this dispute: Project 12-001 (the "Claiborne Project"); Project 12-023 (the "East Bank Project"); Project 12-051 (the "Chevron Project"); and Project 13-020 (the "Methanex Project") (collectively, the "Representative Projects"). (Joint PTO ¶ 20; *see also* (Doc. 52 at p. 5 ("Pursuant to an agreement between the parties, Defendants' discovery responses are limited to a sample of four projects from Cajun's tax year ending September 30, 2013."))).

To follow is a brief description of each Representative Project, with particular

---

[1] The IRS issued Defendants a refund check in the amount of $671,071.38, comprised of the Contested Refund ($576,756.00 principal *plus* $73,663.38 interest), *plus* an additional refund of $20,652.00 that is *not* at issue in this case. (Joint PTO ¶¶ 12-14).

attention to the terms of the underlying contracts.[2] *See Tangel v. Comm'r of Internal Revenue*, 121 T.C.M. (CCH) 1001, 2021 WL 81731 at \*4 (T.C. 2021) (instructing that "the parties' contract" determines who is entitled to the QRTC (citing authorities)); *Populous Holdings, Inc. v. Comm'r of Internal Revenue*, No. 405-17, 2019 WL 13032526, at \*2 (T.C. Dec. 6, 2019) (instructing that courts consider "payment procedures, quality and performance standards, termination clauses, and warranty and default provisions" when determining entitlement to the QRTC).

### a. The Methanex Project

In 2012, Cajun executed a construction services subcontract (Doc. 64-1, the "Methanex Subcontract" or "Mx Subcontract") with Jacobs Field Services ("Jacobs") to perform site preparation for the relocation of Methanex USA, LLC's methanol plant from Chile to Geismar, Louisiana. Cajun's original scope of work was broadly defined, and subject to a "capped"[3] (not-to-exceed) price of $6,485,000. (Mx

---

[2] The parties have each submitted excerpts of the underlying contracts, focusing on the contractual terms most relevant to the instant dispute. There is substantial overlap among the parties' excerpts, though, in all instances, the Government's excerpts are more inclusive than Defendants' excerpts. For simplicity, the Court cites to the Government's excerpts only, except to the extent that a critical contract term is included only in the excerpts provided by Defendants.

[3] A "capped" contract is a contract under which the contractor is paid for labor and other expenses, plus a mark-up, subject to an agreed upon maximum price. Under a capped contract, the contractor typically bills the client for labor and other expenses incurred up until the maximum amount is reached. By contrast, a "fixed-price" contract is a contract under which the contractor agrees to perform contracted work for a fixed total price that is specified at contract formation. Typically, under a fixed-price contract, the contractor submits invoices based upon completing particular milestones or percentages of work. A third type of contract is an uncapped "cost-plus" contract, under which the contractor is paid for all time and material costs incurred for the project. *See Geosyntec Consultants, Inc. v. United States*, No. 12-cv-80334, 2013 WL 5328479, at \*5 (S.D. Fla. Apr. 17, 2013), *aff'd*, 776 F.3d 1330 (11th Cir. 2015). As set forth below, this case involves capped and fixed-price contracts only.

Subcontract at Recitals ¶¶ 3, 10; *id.* at Ex. "A" (Scope of Work)). Through dozens of written change orders, Cajun's scope of work gradually expanded to include site establishment, construction of temporary facilities, earthwork, underground piping, and concrete foundations, for which Cajun was ultimately paid $90 million. Cajun performed its work according to plans provided by Jacobs, (*see* USA SOF ¶ 40; Defendants SOF ¶ 40), and completed the Methanex Project in December 2014. (Joint PTO ¶¶ 36-38, 51, 62-63).

The Methanex Subcontract is composed of a Construction Services Agreement ("CSA") and 10 Exhibits ("Ex."). Most relevant here, the Exhibits include a detailed scope of work (Ex. A); terms of monthly payment (including additional payment for changes to Cajun's original scope of work) (Ex. C); line-item pricing for Cajun's labor costs (including "Project Cost Engineer" wages), services and materials (Ex. D); and quality control standards, including standards for Jacobs' review and approval of Cajun's work (Ex. G).

As stated, Jacobs originally agreed to pay Cajun a "NOT TO EXCEED PRICE [of] **$6,485,000**" to perform "the Scope of Work as outlined in Ex. A," with compensation "based on billed actual manhours and actual cost of other cost reimbursable items in accordance with the agreed … rates as included in this Ex. D." (Mx Subcontract at Ex. D §§ 2.1-2.2; *see also id.* at Recitals ¶ 10). However, the Methanex Subcontract makes additional compensation available to Cajun in stated circumstances. Specifically, General Conditions ("GC") § 8 ("Changes") provides that if Jacobs demands an adjustment to Cajun's scope of work, Cajun is entitled to submit

a "prior written change order" negotiating a new contract price. (Mx Subcontract GC § 8A). In such instances, "[a]dditional compensation for changes shall, at [Jacob's] sole discretion, be determined by … (i) negotiated lump sum; (ii) time and materials; (iii) unit price; or (iv) any combination of the foregoing." (*Id.*).

The Methanex Subcontract requires Cajun to submit "an application for payment … on or before the tenth day of each month, for Work completed during the preceding month." (Mx Subcontract GC § 9(A)). Cajun's monthly applications are subject to Jacobs' "approval," and Jacobs is entitled to demand "supporting documentation … reasonably require[d] to evidence … [Cajun's] entitlement to the amounts claimed." (Id. at §§ 9(A), (E)). Upon approval, Jacobs must pay Cajun within 10 days of Jacobs' "receipt of the corresponding payment from [Methanex USA]," less a 10 percent retainage. (*Id.* at § 9(A)). Payment of the retainage is due after Jacobs' final acceptance of Cajun's work. (*Id.*). Jacobs' final acceptance is conditioned on Cajun's delivery of a lien waiver showing that Cajun performed its work "completely … and that there are no unsatisfied or undischarged claims, demands, losses, liens, attachments or encumbrances arising out of the Subcontract." (*Id.*).

Cajun's work under the Methanex Subcontract is subject to quality assurances and controls set forth in Exhibit G. Among these assurances, Cajun is required to bear the cost of remediating any work that fails to conform to "Project requirements":

> Subcontractor [Cajun] shall remain totally responsible for the quality and accuracy of its Work which shall at all times conform to Project requirements. In the event that the results of tests performed are not in accordance with Project requirements, Subcontractor shall be responsible for any repair, rework, re-testing and/or additional testing required as a result of the Work not being compliant with Project

requirements. The costs associated with any repair, rework, re-testing, and/or additional testing required as a result of the Work not being compliant with Project requirements shall be to Subcontractor's account.

(Mx Subcontract Ex. G at § 1.9). Essentially the same term is repeated at Exhibit A (Scope of Work) Section 23.6.

Finally, and importantly, the Methanex Subcontract sets forth detailed terms regarding Cajun's right (or lack thereof) to its "Work Product," stating that all Cajun's Work Product under the Methanex Contract is "work made for hire" owned by Methanex USA:

26. OWNERSHIP OF WORK PRODUCT, DRAWING AND TECHNICAL DOCUMENTATION BY OWNER.

A. All Work Product prepared by Subcontractor [Cajun] shall be "works made for hire," and all rights, title and interest to the Work Product, including any and all copyrights in the Work Product, shall be owned by Owner [Methanex USA, LLC] irrespective of any copyright notices or confidentiality legends to the contrary which may have been placed in or on such Work Product by Subcontractor. If, for any reason, any part of or all of the Work Product is not considered a work made for hire for Owner or if ownership of all right, title and interest in the Work Product shall not otherwise vest in Owner, then Subcontractor agrees that such ownership and copyrights in the Work Product, whether or not such Work Product is fully or partially complete, shall be automatically assigned from Subcontractor to Owner without further consideration, and Owner shall thereafter own all right, title and interest in the Work Product, including all copyright interests.

(Mx Subcontract GC § 26(A)).

"Work Product" is defined expansively, and means:

all documents, data, analyses, reports, plans, procedures, manuals, drawings, specifications, calculations, or other technical tangible manifestations of Subcontractor's [Cajun's] efforts (whether written or electronic) created by Subcontractor in the performance of the Work, including but not limited to all Documents.

7

(Mx Subcontract GC § 1). This definition incorporates two additional expansively-defined terms, "Documents" and "Work":

> "Documents" means any or all tracings, designs, drawings, field notes, requisitions, purchase orders, specifications, electronic information (including but not limited to data files, operating codes, executable computer programs, output therefrom, and other software in any form), and other documents or records developed or acquired by Subcontractor and its suppliers or sub-subcontractors in performing the Work.
>
> …
>
> "Work" means the work, services, deliverables, duties and activities to be performed or provided by, or on behalf of, Subcontractor under this Subcontract as more fully described in the Scope of Work [Ex. A].

(Mx Subcontract GC § 1).

### b. The Chevron Project

In 2011, Cajun contracted with Chevron (Doc. 64-24 *and* Doc. 77-25, collectively the "Chevron Contract") to perform construction services as part of Chevron's expansion of its refinery in Pascagoula, Mississippi. The Chevron Project was multi-phase, and Cajun's scope of work included backfill, concrete, excavation, earthwork, piling installation and testing, concrete foundations, underground piping and utilities, road work, soil remediation, and tank testing. (Joint PTO ¶¶ 71, 90-91). Cajun performed its work according to plans provided by Chevron, and completed the Chevron Project in April 2013. (Joint PTO ¶¶ 97, 112).

The Chevron Contract includes of 44 pages of Terms and Conditions ("T&C"), and 11 Exhibits. Relevant here, Exhibit A provides a detailed Scope of Work, and Exhibit B provides an expansive Schedule of Compensation.

Like the Methanex Subcontract, the Chevron Contract is "capped," setting a

not-to-exceed amount[4] that Chevron agrees to pay Cajun "in accordance with Exhibit B – Schedule of Compensation for Work conforming to Contract requirements." (USA SOF ¶ 86; Defendants SOF ¶ 86; Chevron Contract T&C § 7.1). In turn, Exhibit B sets forth a table specifically allocating certain costs among the parties (Chevron Contract Ex. B-1 (Allocation of Cost)), and line-item pricing for Cajun's labor, services, and materials (Chevron Contract Exhibits B-2 through B-8). Exhibit B provides that Cajun shall be reimbursed for wages of all Cajun employees (including "Project Engineers") "performing … Work" on the Chevron Project (*see* Chevron Contract Ex. B-1 §3.1(A), Ex. B-2 Item # 11), and that Cajun shall also be reimbursed "the cost of testing the completed Facility or parts thereof, if necessary" (*see* Chevron Contract Ex. B-1 §7.6).

Despite being "capped," the Chevron Contract also provides that additional compensation is available to Cajun in stated circumstances. Specifically, Terms and Conditions § 4 ("Changes") states that if Chevron demands an increase "in the quantity, character, kind or execution of the Work," Cajun may respond with "a written estimate … based upon the rates established in Exhibit B … for the cost of performing the [additional] Work." (Chevron Contract T&C §§ 4.1-4.2). The parties will then execute a written change order allowing Cajun to proceed with the additional work at the new price. (*Id.* at § 4.2). Additionally, if Chevron demands an adjustment to Cajun's scope of work, Cajun may respond with a "written notice"

---

[4] The parties agree that the Chevron Contract is capped, but do not specify the Contract's not-to-exceed amount here. (*See* USA SOF ¶ 86; Defendants SOF ¶ 86).

seeking "price adjustment" for labor, services, and materials. (Chevron Contract T&C § 4.3).

The Chevron Contract requires Cajun to submit weekly invoices to Chevron for "craft labor," and monthly invoices for "all other reimbursable costs," supported by "evidence [of] receipted bills, expense accounts …, third party invoices, releases and waivers of lien rights, or other specific and detailed documentation." (Chevron Contract T&C §§ 8.2-8.3). Thereafter, within 30 days, Chevron must pay Cajun "the [undisputed] compensation provided under a Work Authorization," subject to a 5 percent retainage. (*Id.* at §§ 8.3, 8.5). Chevron is only allowed to withhold payment to the extent that Chevron disputes Cajun's supporting documentation, and even then only until such time that Cajun "amends the invoice in satisfaction of the dispute or provides the required documentation to substantiate invoice details." (*Id.* at § 8.5.2). Cajun is entitled to payment of the retainage "after 90 days from Mechanical Completion, provided that there are no undischarged or unsecured liens, attachments or claims in connection with the Work." (*Id.* at §8.3).

Cajun's work under the Chevron Contract is subject to Chevron's "provisional" and "final" acceptance. "Provisional Acceptance" is conditioned on three factors: "(i) actual, Contract-compliant completion of the Subject system or Work authorization; (ii) the subject Work is tight, internally, and externally clean, and (as applicable) has been properly precommissioned [sic], adjusted, and tested; and (iii) all of [Cajun's] Construction Equipment, other supplies, personnel and debris has been removed from the Work Areas." (Chevron Contract T&C § 6.1). "Final Acceptance" is

conditioned on Chevron's receipt of: "all Technical Information" (discussed below); releases; materials audits/reconciliations; and documentation supporting government permits. (*Id.* at § 6.5)

Additionally, the Chevron Contract states that Cajun's work is subject to Cajun's guarantee(s) that it will perform "in a safe, diligent, skillful and workmanlike manner, in accordance with generally accepted industry practices and sound engineering principles," and, further that Cajun's "services … Materials or processes" will not "violate or otherwise infringe upon any third party's intellectual property rights." (*Id.* at § 13.1).

Finally, like the Methanex Contract, the Chevron Contract sets forth detailed terms regarding Cajun's right (or lack thereof) to its "Work Product"—and, specifically its "Technical Information"—stating, in relevant part:

18. CONFIDENTIALITY AND WORK PRODUCT

18.1. CONTRACTOR [Cajun] agrees that Technical Information will be used only for performance of the Services for COMPANY [Chevron].

18.2. Technical Information shall not be disclosed to any third party without COMPANYs express written consent, … [excluding Technical Information that is "[a]vailable generally to the public through no act or omission of CONTRACTOR."]

…

18.3. Article 18 shall remain in force and effect and binding on CONTRACTOR notwithstanding the termination of this Contract in all other respects. …

18.4. All inventions, discoveries and improvements (patentable and unpatentable) that are made or conceived by CONTRACTOR or CONTRACTOR's employees in performing the Services and all domestic and foreign patent rights based thereon shall belong to COMPANY or an Affiliate designated by COMPANY. CONTRACTOR shall promptly

11

and fully disclose all such inventions, discoveries and improvements to COMPANY or the designated Affiliate. CONTRACTOR shall cooperate as may reasonably be required in order to obtain patent protection therefore, including the signing of any proper affidavits, patent applications and the like. Furthermore. CONTRACTOR and employees of CONTRACTOR shall assign any and all patent applications resulting therefrom to the designated Affiliate. The cost of obtaining patent protection shall be borne by COMPANY. …

18.5. Equitable Relief. CONTRACTOR acknowledges and agrees that due to the unique nature of the Technical Information there may be no adequate remedy at law for any breach of the obligations set out in this Article 18, and that any breach of these obligations may allow CONTRACTOR or another person to compete unfairly with COMPANY resulting in irreparable harm to COMPANY. Accordingly, CONTRACTOR agrees that upon a breach (or threat of a breach), COMPANY is entitled to immediate equitable relief, including a restraining order and preliminary injunction, and COMPANY may seek indemnification from CONTRACTOR for any loss or harm in connection with any breach or enforcement of CONTRACTOR's obligations provided in this Article 18 or for the unauthorized use or release of Technical Information. CONTRACTOR shall notify COMPANY immediately upon the occurrence of any unauthorized release of Technical Information or other breach of this Article 18.

(Chevron Contract T&C § 18).

"Technical Information" is defined expansively, and means:

any and all information, data and knowledge which is either made available to CONTRACTOR by COMPANY relating to the performance of the Work, or developed by CONTRACTOR as a consequence or arising out of this Contract. Technical Information includes all inventions, discoveries or improvements (patentable or otherwise) that are made or conceived by CONTRACTOR in performing the Work and all patent rights associated with these inventions, discoveries or improvements."

(Chevron Contract T&C § 1.1.31). This definition incorporates one additional

expansively-defined term, "Work":

 "Work" and "Services" are interchangeable and mean (unless the context requires otherwise) all work, services, operations or activities identified as Contractor's scope of work under this Contract and in each relevant Work Authorization and all other activities that are required

for Contractor's full performance of its obligations under this Contract. (Chevron Contract T&C § 1.1.36).

### c. The Claiborne Project

In September 2011, the United States Army Corps of Engineers (the "Corps") awarded Cajun a federal public-bid contract (Doc. 64-18, the "Claiborne Contract") to construct a box culvert (underground canal), as part of a flood control system at South Claiborne Avenue in New Orleans, Louisiana. (Joint PTO ¶ 156). The Claiborne Contract described Cajun's work as "construction of a pile founded concrete box culvert, clearing and grubbing, excavation, construction, dewatering, driving sheet piles, driving timber piles, utility relocations, maintenance and diversions of storm water, box culvert construction, asphalt road work, fertilizing and seeding, backfilling, and other incidental work as specified in the specifications and as indicated on the drawings." (Claiborne Contract Solicitation, Offer, and Award ("SOA") § 10). Cajun performed its work according to plans provided by the Corps; the Corps accepted Cajun's work on the Claiborne Project in September 2017. (Joint PTO ¶¶ 160-161, 172, 188).

The Claiborne Contract was a "firm fixed price contract" (Joint PTO ¶ 158), bid by Cajun for a total amount of $25,971,694.50. (Claiborne Contract SOA § 22). The Claiborne Contract sets forth Cajun's line-item deliverables, and anticipated costs for each deliverable priced by unit or by lump sum. (Joint PTO ¶ 158; (Claiborne Contract Bidding Schedule – Alternate 1)).

Importantly, the Claiborne Contract incorporates numerous provisions of the Federal Acquisition Regulations (FAR)—both "by reference" and "by full text."

13

(Claiborne Contract pp. 25-30).

FAR 52.232-5 (Sept. 2002)[5]—incorporated by reference (Claiborne Contract at p. 27)—governs "Payment Under Fixed-Price Construction Contracts," and requires the Corps to pay Cajun "the contract price as provided in this contract" pursuant to monthly progress payments. FAR 52.232-5(a), (b). Cajun is required to support its monthly payment requests with "[a]n itemization of the amounts requested, related to the various elements of work required by the contract covered by the payment requested"—including detailed information related to any subcontractor retained by Cajun—as well as a certification stating that "[t]he amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract." *Id.* at §§ (b)(1), (c). Upon receipt, the Corps determines whether Cajun has made "satisfactory progress," and, if so, pays Cajun "in full." *Id.* at § (e). If, however, "satisfactory progress has not been made," the Corps may withhold a 10 percent retainage "until satisfactory progress is achieved." (*Id.*).

Despite being "fixed price," the Claiborne Contract allows for additional compensation to Cajun in stated circumstances. Specifically, FAR 52.243-4 (June 2007)[6]—incorporated in "full text" (Claiborne Contract at p. 41)—governs "Changes" and requires the Corps to "make an equitable adjustment and modify [the price of] the contract in writing" in the event the Corps changes the "specifications," the "method or manner of performance of the work," or other factors that result in

---

[5] All citations and references herein to FAR 52.232-5 are to the September 2002 version.

[6] All citations and references herein to FAR 52.243-4 are to the June 2007 version.

increased cost *or* time required for the Claiborne Project. FAR 52.243-4(a), (d).
Additionally, the Claiborne Contract allows Cajun to recover ownership and
operating costs for "construction and marine plant [sic] and equipment in sound
workable condition," as well as "[e]quipment rental costs." (Claiborne Contract at p.
39). The Corps also agrees to reimburse Cajun "the amount of premiums paid for
performance and payment bonds (including coinsurance and reinsurance
agreements, when applicable) after [Cajun] has furnished evidence of full payment to
the surety." FAR 52.232-5(g).

The Claiborne Contract conditions final payment on Cajun's satisfaction of
three requirements: "(1) Completion and acceptance of all work; (2) Presentation of a
properly executed voucher; and (3) Presentation of release of all claims against the
Government arising by virtue of this contract." FAR 52.232-5(h).

Finally, the Claiborne Contract sets forth terms regarding Cajun's right (or
lack thereof) to its "material and work," stating, in relevant part:

> (f) Title, liability, and reservation of rights. All material and work
> covered by progress payments made shall, at the time of payment,
> become the sole property of the Government[.]

FAR 52.232-5(f). This provision incorporates the term "work," which, under the
applicable (2011) FAR 2.101,[7] is defined as follows (in relevant part):

> Building or work means construction activity as distinguished from

---

[7] The Claiborne Contract incorporates by reference FAR 52.202-1 Definitions (July 2004), (Doc. 64-18 at p. 25), which states that "[w]hen a … contract clause uses a word or term that is defined in the [FAR], the word or term has the same meaning as the definition in FAR 2.101 in effect at the time the solicitation was issued." FAR 52.202-1 (July 2004). The Corps solicited the Claiborne Contract in August 2011. (Claiborne Contract SOA § 3). Accordingly, the 2011 version of FAR 2.101 applies, and all references herein to FAR 2.101 are to the 2011 version.

manufacturing, furnishing of materials, or servicing and maintenance work. The terms include, without limitation, buildings, structures, and improvements of all types, such as bridges, dams, plants, highways, parkways, streets, subways, tunnels, sewers, mains, power lines, pumping stations, heavy generators, railways, airports, terminals, docks, piers, wharves, ways, lighthouses, buoys, jetties, breakwaters, levees, canals, dredging, shoring, rehabilitation and reactivation of plants, scaffolding, drilling, blasting, excavating, clearing, and landscaping."

FAR 2.101 Definitions (2011).

### d. The East Bank Project

In January 2012, the Sewerage and Water Board of New Orleans ("SWBNO") awarded Cajun a state public-bid construction contract (Doc. 64-29, the "East Bank Contract") as part of SWBNO's improvements to the flood protection system at the East Bank Wastewater Treatment Plant in New Orleans. (*See* East Bank Contract § 1-03(A) (Scope And Extent Of Contract)). Cajun's work under the East Bank Contract consisted of installing/repaving an access road; relocating pipelines and utilities; excavation; demolition; driving piles; constructing "concrete footing and T-wall"; and installing three metal floodgates, drainage, and "entrance stairs and emergency exit stairs." (*See id.*). Cajun performed its work according to plans provided by SWBNO (*see* East Bank Contract ¶ 30 (Drawings and Specifications); *see also* § 1-02 (Scope And Extent Of Contract)); SWBNO accepted Cajun's work on the East Bank Project in October 2015. (Joint PTO ¶ 150).

The East Bank Contract is also a "fixed price contract," (Joint PTO ¶ 126), bid by Cajun for the "full sum" of $24,391,466.00. (*See* East Bank Contract p. 3; Joint PTO ¶ 126). Nonetheless, the East Bank Contract provides that additional compensation is available to Cajun when "clearly shown that such special

16

construction is beyond the scope and intent of the original plans and specifications." (East Bank Contract ¶ 31 (Drawings and Specifications)). The parties agree that through various change orders, the East Bank Contract "increased by more than $5 million for a total value of $29.4 million." (Joint PTO ¶ 127).

The East Bank Contract provides that Cajun will be paid on a monthly basis for "work actually performed, at the prices bid in [Cajun's] proposal, plus whatever payments for extra work may be approved … as full compensation for furnishing all the labor, materials, tools. equipment, etc., needed to complete the whole work of the contract, well and faithfully done, in accordance with the drawings and specifications, and meeting the requirements of the Engineer." (*See* East Bank Contract ¶ 52 (Monthly Payments)). Critically, Cajun's monthly payments expressly *include* "full compensation for all loss, damages or risks of every description, connected with or resulting from the nature of the work, or from any obstructions or difficulties encountered, of any sort or nature whatsoever, or from the action of the elements; also for all expenses in consequence of the suspension or discontinuance of the work as provided for in the contract." (*Id.*).

Additionally, the East Bank Contract makes express allowances for payment of "laboratory inspection and testing," stating that if SWBNO's Engineer determines that such inspection or testing is required, SWBNO pays the cost, and Cajun will "not bear any part of the cost of the inspection and testing service." (East Bank Contract ¶ 29 (Laboratory Inspection)).

The Claiborne Contract conditions final payment for Cajun's work on

17

SWBNO's inspection and verification. (East Bank Contract ¶ 56 (Completion Of Contract And Final Payment)). "If no defects are discovered, or when any defects found to exist have been repaired by the Contractor at his own expense, so that all the structures built by him, under this contract, and all the paved or unpaved surfaces disturbed by the work of this contract, are in acceptable conditions … the Engineer will recommend that the contract be accepted by [SWBNO]." (*Id.*).

The East Bank Project Contract does not contain any terms restricting Cajun's right to its research or work product developed in the course of the East Bank Project.

### B. Procedural History

On September 11, 2019, the United States initiated this action seeking to recover the Contested Refund pursuant to 26 U.S.C. § 7405. (Doc. 1; *see also* Doc. 14).

On April 21, 2022, the Court granted the parties' joint motion to bifurcate this matter, allowing the parties to proceed first with a determination of whether Defendants are entitled to the disputed QRTC and, in turn, the Contested Refund (the "Qualification Phase"), and leaving for later (as necessary) the amount of any such QRTC/Refund (the "Quantification Phase"). (Doc. 55). Thereafter, again at the parties' invitation (Doc. 59), the Court issued a revised scheduling order governing the Qualification Phase, setting a fact discovery deadline of August 1, 2022, an expert discovery deadline of October 7, 2022, a dispositive motion deadline of August 15, 2022, and a ten-day trial commencing November 14, 2022. (Doc. 69).

On August 15, 2022, the United States timely submitted the instant Motion for Summary Judgment (Doc. 64). Defendants timely submitted their opposition (Doc.

71), to which the United States timely submitted a reply (Doc. 79).

For reasons set forth below, the United States' Motion will be granted and judgment will be entered in the United States' favor on the issue of Defendants' qualification for the QRTC, obviating the need to proceed to the Quantification Phase.

## II.    ANALYSIS

### A. Standard

Federal Rule of Civil Procedure ("Rule") 56(a) provides that the Court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant bears its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587. Stated differently, "[i]f the party with the burden of proof cannot produce any summary judgment evidence on an essential element of [its] claim, summary judgment is required." *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990).

### B. Applicable Law

The issue presently before the Court is a narrow one: whether Cajun is entitled to the QRTC for the tax year ending September 2013, which, in turn, resulted in the Contested Refund to Defendants. If Cajun is not entitled to the disputed QRTC, Defendants are not entitled to the Contested Refund, and the matter is resolved.

The U.S. Court of Appeals for the Fifth Circuit instructs that "[i]n an action to recover an improperly paid refund, the United States, as plaintiff, bears the ultimate burden of proof to show … that some amount has been erroneously refunded." *United States v. McFerrin*, 570 F.3d 672, 675 (5th Cir. 2009) (*hereinafter McFerrin II*) (quotation marks and alterations omitted). To carry its burden, the Government must "prove either that the [taxpayers] were not entitled to *any* refund … or prove how much of the refund was paid in error." *United States v. McFerrin*, 492 F. Supp. 2d 695, 701 (S.D. Tex. 2007) (*hereinafter McFerrin I*) (citing authorities).

When a disputed refund derives from a claimed tax credit, the Circuit instructs that the taxpayer must produce evidence "to substantiate [the] claimed credit":

> Tax credits are a matter of legislative grace, are only allowed as clearly provided for by statute, and are narrowly construed. Taxpayers are required to retain records necessary to substantiate a claimed credit.

*McFerrin II*, 570 F.3d at 675 (citations omitted); *see also Bubble Room, Inc. v. United States*, 159 F.3d 553, 561 (Fed. Cir. 1998) ("In a tax refund case, the ruling of the Commissioner of Internal Revenue is presumed correct. To rebut this presumption of correctness, the taxpayer must come forward with enough evidence to support a finding contrary to the Commissioner's determination. In addition, the taxpayer has the burden of establishing entitlement to the specific refund amount claimed." (citations omitted)); 26 C.F.R. § 1.41-4(d) (providing substantiation requirement to claim the qualified research credit).

### C. Discussion

#### i. Defendants fail to offer competent evidence or argument establishing that Cajun performed "qualified research"

The QRTC provides a credit for increasing research activities. 26 U.S.C. § 41.

"Qualified research" has four separate and independent requirements: (1) the expenses must be of the type deductible under [26 U.S.C.] § 174; (2) the research must be undertaken "for the purpose of discovering information ... which is technological in nature;" (3) the application of that information must be "intended to be useful in the development of a new or improved business component of the taxpayer;" and (4) substantially all of the research activities must "constitute elements of a process of experimentation."

*McFerrin II*, 570 F.3d at 676 (quoting 26 U.S.C. § 41(d)(1)).

Most relevant here, the third element—"development of a new or improved business component"—requires proof of a "product, process, computer software, technique, formula, or invention which is to be ... (i) held for sale, lease, or license, or (ii) used by the taxpayer in a trade or business of the taxpayer." 26 U.S.C. § 41(d)(2)(B).

Defendants contend that a dispute exists regarding the "business component element" because for each of the Representative Projects, Cajun "develop[ed] construction processes which Cajun used to construct items for its clients." (Doc. 71 at p. 3). This argument fails for two reasons.

First, as noted in the Government's reply memorandum, Defendants' invocation of new "processes" flies in the face of their November 17, 2021 verified supplemental interrogatory responses, which unequivocally state that, as to each Representative Project, Cajun developed a "product." (*See* Doc. 64-15 at pp. 1-2

21

(Defendants' Supplement To The United States' First Set Of Interrogatories For Interrogatories One And Two)). A "product" is plainly *not* a "process"—under any common understanding[8] *or* the Tax Code[9]—and the Government was entitled to rely on Defendants' interrogatory responses when preparing its case—and, more specifically, its motion for summary judgment. *Cf. Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 527 (5th Cir. 2010) ("Although interrogatory responses are not binding judicial admissions, they may be used as evidence for assessing summary judgment." (citations omitted)).

Rule 26(e) obliged Defendants to supplement their interrogatory responses to "correct" their earlier disclosure, and to inform the Government that they intended to prove the business component element through evidence of a "process." No such supplementation occurred. The question that follows is whether Defendants' undisputed failure to supplement their discovery responses bars them from relying on evidence of Cajun's purported new or improved "construction processes" to

---

[8] A "product" is "[s]omething produced by human or mechanical effort," or "[a] direct result; a consequence." PRODUCT, AMERICAN HERITAGE COLLEGE DICTIONARY (3d ed. 1997) Conversely, a "process" is "[a] series of actions, changes, or functions bringing about a result," or "[a] series of operations performed in the making or treatment of a product." PROCESS, *id.* Put simply, a "process" is the *means*, whereas a "product" is the *end*.

[9] The QRTC defines the "business component" to include both a "product" *and* a "process." 26 U.S.C. § 41(d)(2)(B). The Treasury Regulations advise that a "product" and a "production process for the product" are separate business components. See 26 C.F.R. § 1.41-4(b)(1). Additionally, canons of construction require that "different words within the same statute should, if possible, be given different meanings." *BNSF Ry. Co. v. United States*, 775 F.3d 743, 755 n.86 (5th Cir. 2015) (quoting *Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 991 (7th Cir.2001)). To depart from this rule here—that is, to equate "product" with "process" for the purposes of the QRTC—would violate "the rule against superfluities," which holds that "a statute should be interpreted so as not to render one part inoperative." *See id.* at 759 & n.120 (quoting *Colautti v. Franklin*, 439 U.S. 379, 392 (1979)).

establish a contested issue of fact as to the business component element. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").

The answer to this question is determined by the balance of four factors: "(1) the importance of the evidence; (2) the prejudice to the opposing party; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Frey v. Bd. of Supervisors of Louisiana State University*, No. 16-cv-00489, 2018 WL 4089356, at *3 (M.D. La. Aug. 27, 2018) (Jackson, J.) (quoting *Texas A&M Research Foundation v. Magna Transp. Inc.*, 338 F.3d 394, at 402 (5th Cir. 2003)). Here, the balance of these factors heavily favors rejecting Defendants' late-game substitution.

First, evidence of Cajun's new construction processes is plainly important to Defendants, insofar as it is the *only* evidence (*and* argument) offered to establish the business component element of their QRTC claim.[10] At the same time, however, the significance of such evidence is substantially minimized by Defendants' failure to specifically identify even *one* new or improved "construction process" that Cajun

---

[10] Notably, Defendants' opposition memorandum fails to cite any evidence or offer any argument establishing that Cajun's work on the Representative Projects resulted in new "products." Under this Court's Local Civil Rules, Defendants' failure to address the issue of whether Cajun's work resulted in a new or improved products acts as a waiver. *See Johnson v. Cooper T. Smith Stevedoring Co., Inc.*, No. 20-cv-00749, 2022 WL 2679436, at *3 n.7 (M.D. La. July 11, 2022) (Jackson, J.) (citing authorities).

developed while working on the Representative Projects (an independent basis for granting the Government's Motion, as set forth below).

Second, the Government is obviously prejudiced by Defendants' about-face. Relying on Defendants' prior interrogatory responses, the Government focused its summary judgment evidence and argument exclusively on whether Cajun developed new or improved "products" (arguing, in each instance, that Cajun did *not* develop any such products). (*See* Doc. 64-1 at pp. 12-13). Now Defendants have effectively pulled the rug from under the Government's case, depriving the Government of an opportunity to develop evidence contradicting Defendants' re-stated position.

Third, an eleventh hour continuance to re-open discovery would obviously mitigate prejudice to the Government. Any such continuance, however, would disturb the November 2022 trial date. Additionally, a continuance would necessarily include yet another round of summary judgment briefing—to allow the Government a fair chance to address Defendants' new arguments prior to trial—delaying trial for months, at minimum. This case is already more than three years old, and all sides deserve a resolution.

Finally, Defendants have offered no explanation whatsoever for their change of tack. Even now—weeks after the Government raised the issue of Defendants' surprise substitution in its reply brief (Doc. 79 at p. 3)—Defendants have not addressed the issue, much less sought leave to supplement their discovery responses.

Balancing these factors, the Court easily determines that the proper sanction for Defendants' failure to supplement their discovery responses is to preclude

Defendants from relying on evidence (and related argument) that Cajun developed "processes" capable of satisfying the business component element of the QRTC. Fed. R. Civ. P. 37(c)(1); *see Alldread v. City of Grenada*, 988 F.2d 1425, 1436 (5th Cir. 1993) (district court properly excluded evidence based on offering party's failure to supplement interrogatory responses (citing authorities)); *Guidry v. Aventis Pharms., Inc.*, No. 03-cv-493, 2005 WL 8155425, at *2 (M.D. La. Dec. 20, 2005) (excluding evidence offered in opposition to summary judgment based on offering party's failure to supplement its Rule 26 disclosures). As a result, Defendants have failed to produce any competent evidence supporting an essential element of their QRTC claim, and summary judgment is required. *Geiserman*, 893 F.2d at 793.

But even if the Court looks past Defendants' dilatory tactics, their belated reliance on "construction processes" fails for yet another reason: lack of specificity. As indicated above, Defendants vaguely reference new "construction processes" throughout their opposition memorandum, yet fail to specifically identify even *one* new or improved process that resulted from Cajun's work on the Representative Projects. Instead, as to each Project, Defendants equate new or improved "processes" with Cajun's "methods of construction," stating without elaboration that "Cajun performed engineering analyses that fundamentally relied on engineering principles, which allowed Cajun to determine the proper method of construction." (*See* Doc. 71 at pp. 19-21). As a result, the Court is left to guess what "construction processes" (if *any*) Defendants contend are new or improved.

Vague and conclusory statements cannot create an issue of fact capable of

withstanding summary judgment. *E.g.*, *Allen v. Our Lady of the Lake Hosp., Inc.*, No. 19-cv-00575, 2022 WL 2921001, at \*5 n.9 (M.D. La. July 25, 2022) (Jackson, J.) ("As a rule, summary judgment evidence 'must be particularized, not vague or conclusory.'" (quoting *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 161 (5th Cir. 2021)). Moreover, this Court has repeatedly admonished that that it "will not speculate on arguments that have not been advanced, or attempt to develop arguments on a party's behalf." *Johnson*, 2022 WL 2679436, at \*3 n.7. Defendants' obfuscation deprives the Court of any meaningful criteria by which to measure whether Cajun's alleged "construction processes" were, in fact, new or improved, as required to establish the business component element. For present purposes, the result is the same: Defendants fail to create a contest as to a material element of their QRTC claim, and summary judgment is required. *Geiserman*, 893 F.2d at 793.

### ii. Any "qualified research" that Cajun performed fails the "funded research" exclusion

Defendants' QRTC claim fails for another reason: Cajun's alleged research was "funded" within the meaning of the Tax Code, and thus expressly *excluded* from eligibility for the QRTC.

"Funded research" is one of eight express exclusions to the QRTC, and means "[a]ny research to the extent funded by any grant, contract, or otherwise by another person (or governmental entity)." 26 U.S.C. § 41(d)(4)(H). The U.S. Tax Court recently explained that the rationale for the "funded research" exception is to prevent two parties from claiming the same QRTC:

> Section 41 allows a credit to taxpayers who increase their research expenses above a base amount. Sec. 41(a), (c). "Qualified research

26

expenses" include in-house research expenses and contract research expenses. Sec. 41(b)(1). "In-house research expenses" include wages paid to employees who engage in (or directly supervise) qualified research and amounts paid or incurred for supplies used in the conduct of qualified research. Sec. 41(b)(2). "Contract research expenses" are amounts paid by a taxpayer to a person other than an employee to perform qualified research. See sec. 41(b)(3).

When a contractor … performs research in fulfilling a contract with its customer, each party may have a possible claim to the research credit: [the contractor's] credit would be based on its in-house research expenses and [the customer's] would be based on its contract research expenses. To prevent double claiming of the credit and to determine which contracting party is entitled to the credit, the statute provides that qualified research does not include "funded research." Sec. 41(d)(4)(H).

*Tangel*, 2021 WL 81731 at *3.

To determine whether research is "funded," the Tax Regulations direct the Court to focus on the underlying contract(s). 26 C.F.R. § 1.41-4A(d)(1) ("All agreements (not only research contracts) entered into between the taxpayer performing the research and other persons shall be considered in determining the extent to which the research is funded."); *see Tangel*, 2021 WL 81731 at *4; *Fairchild Indus., Inc. v. United States*, 71 F.3d 868, 870 (Fed. Cir. 1995) ("In an accordance with Treasury Regulation § 1.41–2(e)(2) the contractual arrangement is the factor that determines who is entitled to the tax benefit[.]"), *modified* (Feb. 23, 1996).

When it is not obvious from the underlying contract(s) whether the claimed research was "funded," the Regulations instruct the Court to consider two main factors: First, "[a]mounts payable under any agreement that are contingent on the success of the research … are not treated as funding." *Id.* In such circumstances the party performing the research is entitled to the QRTC because it bears the risk of

failure. *See* 26 C.F.R. § 1.41-2(e)(2); *see also Fairchild Indus.*, 71 F.3d at 870.

Second, a taxpayer is entitled to the QRTC only if it "retains substantial rights in the research." 26 C.F.R. § 1.41-4A(d)(3)(i). "If a taxpayer performing research for another person retains no substantial rights in research under the agreement providing for the research, the research is treated as fully funded…, and no expenses paid or incurred by the taxpayer in performing the research are qualified research expenses." *Id.* at § 1.41-4A(d)(2). The Regulations further advise that a contractor does *not* maintain substantial rights where the underlying contract "confers on another person the exclusive right to exploit the results of the [contractor'] research." *Id.* In other words, the contractor "does not retain substantial rights in the research if the [contractor] must pay for the right to use the results of the research." *Id.* at § 1.41-4A(d)(3)(i); *see Tangel*, 2021 WL 81731 at *4.

"Incidental benefits to the taxpayer from performance of the research (for example, increased experience in a field of research) do not constitute substantial rights in the research." 26 C.F.R. §1.41-4A(d)(2).

In sum,

> If the taxpayer does not have the right to use or exploit the results of the research, its expenditures are not entitled to the tax credit regardless whether there is an agreement that the research will be paid for only if successful, and regardless whether the taxpayer receives some "incidental benefit" such as increased experience.

*Lockheed Martin Corp. v. United States*, 210 F.3d 1366, 1374–75 (Fed. Cir. 2000).

Importantly, at summary judgment, Defendants must establish a plausible contractual basis to conclude that Cajun retained substantial rights in its research. *Dynetics, Inc. & Subsidiaries v. United States*, 121 Fed. Cl. 492, 523 (2015) ("Dynetics

28

bears the burden of showing it had substantial rights in the results of the research.").

For each Representative Project, Defendants assert that payment was contingent on the success of Cajun's research *and* that Cajun retained substantial rights in its research. (Doc. 71 at pp. 24-27). Defendants' arguments, however, are not convincing. For reasons explained below, the plain terms of the contracts underlying the Representative Projects dictate *either* that Cajun relinquished its right to any research *or* was paid for its research, such that if even if Cajun engaged in qualified research, the resulting QRTC can be claimed only by Cajun's contracting counterpart. *See Tangel*, 2021 WL 81731 at *3,

### a. Cajun relinquished all rights to its research under the Methanex, Chevron, and Claiborne Contracts

As stated, Defendants stake their QRTC claim solely on new or improved "methods of construction"—"construction processes"—developed by Cajun while working on the Representative Contracts. (*See* Doc. 71 at pp. 19-21). The Methanex, Chevron, and Claiborne Projects each fail the "substantial rights" prong of the "funded research" exclusion because in each instance Cajun transferred *all* rights to any new or improved "construction processes" to its contracting counterpart.

Again, to retain "substantial rights" Cajun must, at minimum, maintain the right to use or exploit its research without having to pay for it. 26 U.S.C. § 1.41-4A(d)(2); *Lockheed Martin*, 210 F.3d at 1374–75. Cajun plainly retained no such right under the Methanex contract, which states that Cajun's "Work Product" is "work[] made for hire," *and*, further, expressly transfers ownership of *all* Cajun's Work Product to Methanex USA.

29

Cajun's express consent to a "work for hire" contract is significant of itself, because it strongly signals that Cajun relinquished ownership of any new or improved methods of construction to Methanex USA. "Work for hire" is a term of art derived from Copyright law; for 120 years it has meant "work ... produced at the instance and expense of [an] employer." *See Brattleboro Pub. Co. v. Winmill Pub. Corp.*, 369 F.2d 565, 567 (2d Cir. 1966) (discussing *Bleistein v. Donaldson Lithography Co.*, 188 U.S. 239, 248 (1903)). Under the modern Copyright Act, "work for hire" means *both* work produced by an employee within the scope of employment, *and* work produced by an independent contractor under a written agreement. 17 U.S.C. § 101. Under a "work for hire" contract, "the ... person for whom the work was prepared is considered the author ..., and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b). Put simply, "work for hire" is work that is ordered, paid for, and owned by the party that commissions it.

Cajun's execution of a contract expressly stating that *all* Cajun's "Work Product"—defined expansively to include all "data, analyses, reports, plans, procedures, manuals, drawings, specifications, calculations, or other technical tangible manifestations of [Cajun's] efforts ... created by [Cajun] in the performance of the [work, services, deliverables, duties and activities to be performed or provided ... under this Subcontract]" (Mx Subcontract GC § 1 (definition of "Work Product," incorporating the defined terms "Work" and "Documents"))—is "work[] made for hire" substantially weakens any claim that Cajun can somehow avoid paying Methanex

USA for the right to use or exploit its new construction methods developed in the course of the Methanex Project.[11]

The nail in the coffin is Cajun's express transfer of all "rights, title and interest" to its Work Product to Methanex USA. Together, the Methanex Contract's "work for hire" and transfer of title provisions eliminate any plausible reading under which Cajun retains the right to use new or improved "methods of construction" developed on the Methanex Project without paying for it. *See Dynetics*, 121 Fed. Cl. at 517-519 (engineering firm lacked substantial rights under "work for hire" contract that transferred "all rights, title, and interest" to the results of its work); *Tangel*, 2021 WL 81731 at *4 (engineering firm lacked "substantial rights" under contract that transferred ownership of all "technical information" "supplied" or "designed" under the contract).

The same conclusion obviously applies to the Chevron Project. Under the plain terms of the Chevron Contract, Cajun agreed to use "Technical Information"—*i.e.*, "all inventions, discoveries or improvements (patentable or otherwise) that are made or conceived by [Cajun] in performing the Work"—*only* "for performance of the

---

[11] Indeed, Cajun's express acknowledgment that its Work Product under the Methanex Contract is "work for hire" supports a determination that Cajun's QRTC claim fails *both* prongs of the "funded research" exclusion. For reasons stated above, Cajun's claim fails the "substantial rights" prong because it transferred all ownership of new or improved (copyrightable) construction processes to Methanex. 17 U.S.C. § 201(b). Additionally, Cajun's agreement to a "work for hire" contract supports a finding that Cajun's QRTC claim fails the "payment contingent on success" prong because whatever new construction processes it produced were "at the instance and expense of [Methanex]," *Brattleboro*, 369 F.2d at 567. In any event, having determined that Cajun fails the "substantial rights prong" of the funded research exclusion, the Court does not reach the issue of whether the Methanex Contract also fails the "payment contingent on success" prong. *See also infra* n.12

Services for [Chevron]"; further, Cajun agreed not to disclose "Technical Information … to any third party without [Chevron's] express written consent." (Chevron Contract T&C §§ 18.1-18.2, incorporating the defined term "Technical Information"). If that wasn't enough, Cajun *also* expressly agreed: (1) to forfeit to Chevron any claim to any "inventions, discoveries and improvements "(patentable and unpatentable) that are made or conceived by [Cajun] … in performing the Services"; (2) to "promptly and fully disclose all such inventions, discoveries and improvements to [Chevron]"; (3) to "cooperate as may reasonably be required in order to obtain patent protection"; *and* (4) to *consent* to "a restraining order and preliminary injunction" in the event of Cajun's "unauthorized use or release of Technical Information." (Chevron Contract T&C § 18). Again, there is no room for debate as to the meaning of these provisions: Cajun retained no right to any new or improved methods of construction it may have developed working on the Chevron Project. *See, supra, Dynetics*, 121 Fed. Cl. at 517-519; *see also id.* at 519-523 (engineering firm lacked substantial rights under contract that required contractor to seek approval prior to using or releasing any "materials" or information acquired under the contract).[12]

---

[12] A separate issue is whether the Methanex and Chevron Projects also fail the "payment contingent on success" prong of the "funded research" analysis. *See* 26 C.F.R. § 1.41-2(e)(2). As set forth above, the Methanex and Chevron Contracts are each "capped" contracts under which Cajun agreed to an original not-to-exceed price for labor, material, and expenses. In *Geosyntec Consultants, Inc. v. United States*, the U.S. Court of Appeals for the Eleventh Circuit provided substantial guidance for determining when "capped" contracts fail the "contingent on success" prong. 776 F.3d 1330, 1338 (11th Cir. 2015). Ultimately, the Eleventh Circuit held that the capped contracts in dispute *were* "funded"—and rejected an engineering firm's claim to the QRTC—due to multiple contract terms, which, in sum, ultimately conditioned payment on the engineering firm's "performance … regardless of the success of its research." *See id.* at 1339. These contract terms included: (1) the engineering firm was entitled to additional compensation in specified circumstances; (2) the underlying contracts

32

The Claiborne Project follows suit. Under the Claiborne Contract, "[a]ll material and work covered by progress payments … [became] the sole property of the Government" at the time of payment. FAR 52.232-5(f). Again, the term "work" is defined broadly to mean *all* "construction activity." FAR 2.101 (2011). Logically, any new or improved "method of construction" is part of Cajun's "construction activity." Defendants ignore the obvious question of how Cajun maintained substantial rights to its new methods of construction if all Cajun's construction activities became the

---

did *not* make payment contingent on the success of the firm's research, but instead required payment for the firm's work product even if it did not produce the desired outcome; and (3) the underlying contracts' inspection, acceptance and approval terms were not mandatory prerequisites to payment, instead the firm's invoices were payable upon invoicing unless an item on the invoice was disputed. *See id.* at 1339-43.

Notably, in conducting this analysis, the Eleventh Circuit expressly rejected the engineering firm's argument that its research was not funded because "under the capped contracts … its compensation was fixed," and thus "it ran the risk of not receiving the full ceiling price or, conversely, of exceeding its own budget," explaining:

> these cost-of-performance arguments focus on the amount Geosyntec would be paid and/or the likelihood that its contracts would be profitable, which is of no matter here. Cost-of-performance is not the financial risk with which we are concerned because "the only issue is whether payment was contingent on the success of the research"—that is, the financial risk of failure.

*Id.* at 1339 (quoting *Fairchild Indus.*, 71 F.3d at 872).

The capped Methanex and Chevron Contracts share many of the key characteristics driving the analysis and result in *Geosyntec*. In its principal brief, the Government cites repeatedly to *Geosyntec*, and relies on *Geosyntec* to argue that "[e]ven if Cajun had substantial rights in the projects, the contracts are funded because Cajun's right to payment was not contingent on the success of any research." (Doc. 64-1 at pp. 23-25). Significantly, Defendants fail to even mention *Geosyntec* in their opposition, *much less* distinguish the case, begging the question whether the same result should follow here as to the Methanex and Chevron Projects. Defendants' failure in this regard is conspicuous, because they elsewhere criticize the Government for omitting authorities from its "funded research" exclusion argument. (Doc. 71 at p. 23 n. 107 ("Given the limited number of decisions on the funded research issue, it would be surprising if Plaintiff was unaware of the *Lockheed* rule – particularly since a case Plaintiff cites to in its argument … cites to that case as well.").

Regardless, the Court does not reach the issue of whether the Methanex and Chevron Projects also fail the "payment contingent on success" prong, having already determined that these Projects fail the "substantial rights" prong.

sole property of the Government. (*See* Doc. 71 at p. 27). Defendants' failure in this regard is a tacit admission that they *cannot* overcome the Claiborne Contract's transfer of title provision. *See Johnson*, 2022 WL 2679436, at *3 n.7 (a party's failure to address an issue acts as a waiver); *e.g. Dynetics*, 121 Fed. Cl. at 521 (engineering firm's QRTC claim failed the substantial rights prong where engineering firm failed to address "the obvious question of how it could have substantial rights in the results of the research, if it needed the government's 'authorization' to use those results.").[13]

In sum, Defendants have failed to show any plausible basis to conclude that Cajun retained substantial rights to any research it may have performed on the Methanex, Chevron, and Claiborne Projects. Rather, the plain terms of the underlying contracts dictate the opposite conclusion: Cajun did *not* maintain substantial rights to any research it may have performed under the Methanex, Chevron, or Claiborne Contracts. Again, summary judgment is required. *Geiserman*, 893 F.2d at 793; *e.g.*, *Dynetics*, 121 Fed. Cl. at 523.

### b. Cajun was paid for its research under the East Bank Contract

The East Bank Contract is silent as to Cajun's ownership of construction

---

[13] In *Dynetics, Inc. & Subsidiaries v. United States*, cited above, the U.S. Court of Federal Claims provided extensive guidance regarding the contours of the "substantial rights" prong of the "funded research" exclusion. 121 Fed. Cl. 492, 521 (2015). Not surprisingly, the Government cites *Dynetics* in its opening memorandum, and relies on it to argue that "Cajun did not retain substantial rights in the Methanex, Chevron, or Claiborne Projects." (Doc. 64-1 at pp. 22-23). Surprisingly, Defendants fail to meaningfully address *Dynetics* in their opposition, choosing instead to deflect attention from the case in a footnote. (Doc. 71 at p. 23 n.107). And again, Defendants' failure is particularly galling given their criticism that the Government omitted certain authorities from its opening memorandum. *See supra* n. 12. Going forward, Defendants would do well to avoid hoisting themselves with their own petard.

processes developed during the course of the East Bank Project. Still, the East Bank Project fails the "payment contingent on success" prong of the "funded research" exclusion. Why? Because SWBNO plainly *paid* Cajun for whatever alleged research Cajun may have performed.

The East Bank Contract was a fixed price contract. Fixed priced contracts are presumed to be "unfunded research, qualifying the contractor for the credit." *See Populous Holdings*, 2019 WL 13032526, at *2 (citing authorities). The rationale behind this presumption is easily understood:

> Fixed price contracts are inherently risky for the contractor if the research is unsuccessful. Under fixed price contracts, the contractor must remedy failed research at its own expense. Fixed price contracts "generally place maximum economic risk on contractors who ultimately bear responsibility for all costs and resulting profit or loss."

*Id.* (citing authorities).

But whatever initial presumption may attach to the East Bank Contract, it is definitively rebutted by the Contract's express terms, which provide that Cajun's monthly payments *include*

> full compensation for all loss, damages or risks of every description, connected with or resulting from the nature of the work, or from any obstructions or difficulties encountered, of any sort or nature whatsoever, or from the action of the elements; also for all expenses in consequence of the suspension or discontinuance of the work as provided for in the contract.

(East Bank Contract ¶ 52 (Monthly Payments). Additionally, the East Bank Contract obligated SWBNO and *only* SWBNO to pay the costs of unanticipated "laboratory inspection and testing."  (East Bank Contract ¶ 29 (Laboratory Inspection)).

The upshot is that Cajun was compensated for any risk and attendant costs

"connected with or resulting from the nature of [its] work" on the East Bank Project, and bore no risk that it would be required to pay the costs of additional research or testing. Accordingly, any research Cajun may have performed was "funded" under a plain reading of the "funded research" exclusion, and cannot qualify for the QRTC. 26 U.S.C. § 41(d)(4)(H) ("Funded Research" is "[a]ny research to the extent funded by any grant, contract, or otherwise by another person (or governmental entity).").

### III.    CONCLUSION

In sum, Defendants have failed to produce competent evidence or argument creating a substantial issue of fact that Cajun performed qualified research on the Representative Projects. Additionally, even assuming Cajun performed qualified research on the Representative Projects, the underlying contracts dictate that all such research falls within the "funded research" exclusion. Having now established that Cajun is not entitled to the disputed QRTC, and, in turn, that Defendants are not entitled to the Contested Refund, final judgment will be entered in favor of the United States. *See McFerrin I*, 492 F. Supp. 2d at 701.

Accordingly,

**IT IS ORDERED** that United States' **Motion For Summary Judgment (Doc. 64)** be and is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that the parties' pending **Motions *In Limine* (Docs. 86, 87, 88, 89, 90, 91, 92, 93, and 94)** be and are hereby **TERMINATED AS MOOT**.

36

Final judgment in favor of the United States shall issue separately.

Baton Rouge, Louisiana, this 19th day of October, 2022

_____

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**